**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**RAY and RICKMAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**June 5, 2018**

# In the Court of Appeals of Georgia

A18A0749. MAYNARD et al. v. SNAPCHAT, INC.

RAY, Judge.

Wentworth and Karen Maynard sued Snapchat, Inc. for negligence and loss of consortium to recover for injuries sustained in a car accident that allegedly resulted from the use of Snapchat's Speed Filter. The Maynards filed this interlocutory appeal from the trial court's grant of Snapchat's motion to dismiss on the grounds that Snapchat is immune to liability under the federal Communications Decency Act ("CDA"), 47 USC §230. For the following reasons, we reverse the trial court's order and remand the case to the trial court for further proceedings.

"In ruling on a motion to dismiss, the trial court must accept as true all well-pled material allegations in the complaint and must resolve any doubts in favor

of the plaintiff. We review the trial court's ruling de novo." (Citations omitted.) *Cunningham v. Gage*, 301 Ga. App. 306, 307 (686 SE2d 800) (2009).

The Maynards' complaint alleges that on the evening of September 10, 2015, a car accident occurred between the Maynards and Christal McGee. Heather McCarty was a passenger in the backseat of McGee's vehicle at the time of the accident. McCarty's affidavit recounts the events preceding the accident as follows:

> I looked up and noticed that we seemed to be accelerating. I looked in the front, and saw Christal McGee holding her phone. The screen had a speed on it, which was about 80 m.p.h. and climbing. I asked Christal if her phone was keeping up with the speed of the car. Christal said it was. I told her I was pregnant and asked her to slow down. Christal responded and said she was just trying to get the car to 100 m.p.h. to post it on Snapchat. She said "I'm about to post it." I began pleading with Christal to slow down. I saw the speed on the phone hit 113 m.p.h. before she let off the gas. Just after I saw the speed of 113 m.p.h., a car pulled out of an apartment complex, and I screamed.

As a result of the accident, Wentworth Maynard sustained permanent brain damage.

Snapchat is an application made for mobile devices that allows users to take temporary photos and videos, also known as "Snaps," and share them with friends. Snapchat creates "filters" that allow users to include captions, drawings, and graphic overlays on a user's photos or videos. One of these filters is a speedometer that shows

2

the speed at which a user is moving and allows for that speed to be superimposed to a Snap before sending it out over the application (the "Speed Filter").

The Maynards allege that McGee was using Snapchat and driving in excess of 100 m.p.h. at the time of the crash. The Maynards do not allege that McGee uploaded or posted a Snap using the Speed Filter before the accident occurred.

The Maynards brought suit against both McGee and Snapchat. The Maynards allege that Snapchat knew that its users could "use its service in a manner that might distract them from obeying traffic or safety laws." Further, the Maynards allege that Snapchat's Speed Filter "encourages" dangerous speeding and that the Speed Filter "facilitated McGee's excessive speeding[,]" which resulted in the crash. In granting Snapchat's Motion to Dismiss, the trial court concluded that Snapchat is immune to suit under the CDA because Snapchat was merely the publisher of third-party content, not the creator of content.

1. The Maynards argue that the trial court erred by granting Snapchat's motion to dismiss on the grounds that the CDA provided it with immunity for its Speed Filter. We agree.

Section 230 of the CDA immunizes providers of interactive computer services[1] against liability arising from content created by third parties: "No provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 USC § 230 (c) (1). See *Zeran v. America Online, Inc.,* 129 F3d 327, 330 (II) (A) (4th Cir. 1997) (The CDA was enacted by Congress to provide "federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service").[2] This grant of immunity applies only if the interactive computer service provider is not also an "information content provider," which is defined as someone who is "responsible, *in whole or in part,* for the creation or development of" the offending content. (Emphasis supplied.) 47 USC §230 (f) (3).

---

[1] Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server[.]" 47 USC § 230 (f) (2). See *Carafano v. Metrosplash.com, Inc.*, 207 FSupp2d 1055, 1065-1066 (II) (B) (1) (a) (C.D. Cal. 2002) (an online dating website is an "interactive computer service" under the CDA).

[2] Because there are few Georgia cases applying the CDA, United States District and Circuit Court cases construing the Federal law are instructive. However, "[w]e note that while we are at liberty to consider foreign authority, the appellate courts of this [S]tate are not bound by decisions of other states or federal courts except the United States Supreme Court." (Citation and punctuation omitted.) *Internet Brands, Inc. v. Jape,* 328 Ga. App. 272, 276 (1) (760 SE2d 1) (2014).

Ultimately, the use of the CDA is to "protect internet service providers for the *display* of content created by someone else." (Citation omitted; emphasis supplied). *Jones v. Dirty World Entertainment Recordings LLC*, 755 F3d 398, 406 (II) (B) (6th Cir. 2014).

The CDA states that it was enacted to further certain policy objectives, including:

> to promote the continued development of the Internet and other interactive computer services and other interactive media[,] . . . to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation[, and] . . . to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services[.]

47 USC § 230 (b) (1) - (3).

This Court has held that "three elements are required for § 230 (c) (1) immunity. First, the defendant must be a provider or user of an interactive computer service. Second, the asserted claims must treat the defendant as a publisher or speaker of [that] information. Third, the challenged communication must be information provided by another information content provider." (Citation and punctuation

5

omitted.) *Jape,* supra at 276 (1). Accord *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F3d 12, 19 (II) (A) (1st Cir. 2016); *Federal Trade Commn. v. LeadClick Media, LLC*, 838 F3d 158, 173 (I) (B) (1) (2d Cir. 2016). "[C]ourts have consistently held that § 230 provides a robust immunity, and that all doubts must be resolved in favor of immunity." (Citation and punctuation omitted.) *Jape*, supra. Because the parties do not address the issue of whether Snapchat is a provider of interacive computer services, and appear to agree that it is, we will not address that element.

(a) *Publisher or Speaker.* Under the second element of the Section 230 immunity test, we must determine whether the Maynards' "theory of liability would treat [Snapchat] as a publisher or speaker of third-party content." *Barnes v. Yahoo!, Inc.*, 570 F3d 1096, 1101 (II) (B) (9th Cir. 2009).

The Maynards argue that the trial court erred in concluding that immunity under Section 230 of the CDA applies to their claims against Snapchat because their complaint does not seek to hold Snapchat liable as a speaker or publisher of a third party user's content. Rather, they argue that their complaint seeks to hold Snapchat liable for the negligent creation, design and maintenance of the Speed Filter that encourages excessive speeding, not for the posts themselves. The Maynards reiterate that McGee had made no actual post to Snapchat prior to the car accident.

6

Snapchat cites to *Backpage.com*, supra, *Fields v. Twitter*, 217 FSupp3d 1116 (N.D. Cal. 2016), and *Barnes*, supra, for the assertion that the CDA provides immunity when the duty that the plaintiff alleges the defendant violated derives from the defendant's status as a publisher or speaker, and that it does not matter whether an actual online post was made. However, those cases are distinguishable because they do not involve an incident where a plaintiff attempted to hold an interactive computer service provider liable when no posts were made. Rather, the plaintiffs in those cases sought to hold the interactive computer service provider liable for publishing decisions made regarding online content posted by others. See *Barnes*, supra at 1102 (II) (B) ("publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication *third-party content*") (citation omitted; emphasis supplied); *Backpage*, supra at 22 (II) (A) ("claims that a website facilitates illegal conduct through its posting necessarily treat the website as a publisher or speaker of content provided by third parties and, thus, are precluded by section 230 (c) (1)") (emphasis supplied).

In *Backpage*, supra, victims of sex trafficking sued to hold Backpage, an online classified advertisement forum, liable for participating in the sex trafficking of minors based on Backpage's standards for posting advertisements on its website. Id. at 16 (I).

7

In particular, the plaintiffs objected to the rules "about which terms are permitted or not permitted in a posting, the lack of controls on the display of phone numbers, the option to anonymize e-mail addresses, the stripping of metadata from photographs . . . and Backpage's acceptance of anonymous payments." Id. at 20 (II) (A). The First Circuit, in shielding the website from liability under Section 230 of the CDA, noted that

> the contents of all of the relevant advertisements were provided either by traffickers or by the [victims] themselves (under orders from their traffickers). Since appellants were trafficked by means of [specific] advertisements, there would be no harm to them but for the content of their postings.

Id. at 19-20 (II) (A).

Similarly, *Barnes,* supra, and *Fields,* supra, are distinguishable from the instant case because those cases sought to find the interactive computer service providers liable for harm caused by publishing decisions related to a third parties' content. In *Barnes*, supra, the Ninth Circuit held that Yahoo! was immune from liability under the CDA for failing to remove offensive content that the victim's ex-boyfriend posted under her name in fake online profiles. Id. at 1098 (I), 1106 (III) (C). In doing so, the Court held that the fake profiles were solely created by a third-party information

8

content provider and that the Section 230 (c) (1) of the CDA "by itself, shields from liability all publication decisions, whether to edit, to remove, or to post, with respect to content *generated entirely by third parties.*" (Emphasis supplied.) Id. at 1105 (III) (C). In *Fields*, supra, family members of a government contractor killed by a terrorist organization sued Twitter, alleging that it violated the Anti-Terrorism Act by permitting members of terrorist organizations to sign up for accounts. Id. at 1118. The court in *Fields*, supra, noted that "the decision to furnish an account, or prohibit a particular user from obtaining an account, is itself publishing activity." Id at 1124 (I) Accordingly, the trial court dismissed the complaint.[3]

In *Barnes,* supra, *Fields,* supra, and *Backpage*, supra, the publication of a third-party user's posts caused the harm, and the claims depended on the content of the posts themselves. In the instant case, on the other hand, there was no third-party

---

[3] In contrast, in *Doe v. Internet Brands, Inc.*, 824 F3d 846 (9th Cir. 2016), Jane Doe sued Internet Brands for negligent failure to warn of a danger relating to the operation of Model Mayhem, a networking website for models, alleging that Internet Brands knew about, but did not warn its users, of a scheme to use the website to lure models to a fake audition to be drugged and raped. Id. at 848. The Ninth Circuit held that the CDA did not bar Jane Doe's negligence claim because she did "not seek to hold Internet Brands liable as a 'publisher or speaker' of content someone posted on the Model Mayhem website, or for Internet Brands' failure to remove content posted on the website." Id. at 851 (II). Instead, Jane Doe sought to hold Internet Brands liable "based on its knowledge of the rape scheme[,]" and "for failing to generate its own warning." Id. at 852 (II).

content uploaded to Snapchat at the time of the accident and the Maynards do not seek to hold Snapchat liable for publishing a Snap by a third-party that utilized the Speed Filter. Rather, the Maynards seek to hold Snapchat liable for its own conduct, principally for the creation of the Speed Filter and its failure to warn users that the Speed Filter could encourage speeding and unsafe driving practices. Accordingly, we hold that CDA immunity does not apply because there was no third-party user content published.

(b) Communications provided by another information content provider. As we have concluded in division 1(a) above that the Maynards' claim does not allege that Snapchat was the publisher or speaker of any third-party content, we need not, and herein decline, to address whether the complaint seeks to hold Snapchat liable for the communications of another content provider.

2. Although Snapchat contends that this Court should affirm the trial court's grant of its motion to dismiss under the right for any reason rationale, because the Maynards allegedly did not properly state negligence claims against Snapchat and that the court lacked personal jurisdiction over Snapchat, these issues were not decided by the trial court below.

Under the "right for any reason" doctrine, an "appellate court will affirm a judgment if it is correct for any reason, even if that reason is different than the reason upon which the trial court relied." (Citation omitted.) *City of Gainesville v. Dodd*, 275 Ga. 834, 835 (573 SE2d 369) (2002). However, the right-for-any-reason doctrine is just one of several principles this Court must consider under "the circumstances of individual appeals[.]" Id. at 838. Our Supreme Court has stated that "the tenant that the appellate courts do not rule on issues not ruled on by the trial courts preserves the appellate courts' jurisdiction and delineates the proper roles of the courts[.]" Id.

We find that the remaining arguments raised by Snapchat are hotly contested below and require a review of issues within the trial court's discretion. Thus, we conclude that judicial economy will be "maximized by returning the case to the trial court" in the instant case. Id. Accordingly, we remand the case to the trial court to decide the remaining arguments.

*Judgment reversed and case remanded. McFadden, P.J., and Rickman, J., concur*.